1   **RIKLIS LAW, PLLC**
    KRISTOFER RIKLIS
2   Nevada Bar No. 14754
    871 Coronado Center Dr., Suite 200
3   Henderson, NV 89052
    Telephone: (702) 720-6471
4   Kristofer@riklislaw.com

5   Attorney for CHRISTOPHER J. HADNAGY and
    SOCIAL-ENGINEER, LLC
6
                   UNITED STATES DISTRICT COURT
7
                        DISTRICT OF NEVADA
8

9
    CHRISTOPHER J. HADNAGY, an              Case No.:  2:23-cv-01345-CDS-BNW
10  individual; and SOCIAL-ENGINEER, LLC, a
    Pennsylvania limited liability company,  **PLAINTIFFS' RESPONSE TO**
11                                           **DEFENDANTS' MOTIONS TO DISMISS**
                   Plaintiffs,               **THE COMPLAINT FOR LACK OF**
12                                           **PERSONAL JURISDICTION AND TO**
           v.                                **DISMISS THE COMPLAINT FOR**
13                                           **FAILURE TO STATE A CLAIM [ECF NO.**
    JEFF MOSS, an individual; DEF CON        **13]**
14  COMMUNICATIONS, INC., a Washington
    corporation; and DOES 1-10; and ROE      **ORAL ARGUMENT REQUESTED**
15  ENTITIES 1-10, inclusive,

16                 Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs CHRISTOPHER J. HADNAGY and SOCIAL-ENGINEER, LLC (collectively, "Plaintiffs") file this response to "DEFENDANTS' MOTION TO DISMISS" [ECF No. 13] (the, "Motion"). This Response is supported by the concurrently filed Declaration of Kristofer Riklis, Esq. (the "Riklis Decl."), the exhibits attached thereto, the following Memorandum of Points and Authorities, the papers and pleadings on file herein, and any oral argument the Court may wish to consider.

Dated: October 16, 2023

RIKLIS LAW PLLC
Attorneys at Law


By _____ /s/ Kristofer Riklis _____
KRISTOFER RIKLIS
Nevada Bar No. 14754
871 Coronado Center Dr., Suite 200
Henderson, Nevada 89052
Tel. 702 720 6471

Attorney for CHRISTOPHER J. HADNAGY and
SOCIAL-ENGINEER, LLC

## TABLE OF CONTENTS

I.  INTRODUCTION.................................................................................................1

II.  PROCEDURAL BACKGROUND AND STATEMENT OF RELEVANT FACTS...2

    A.  Procedural Background ...........................................................................2

    B.  Mr. Moss Formed DEF CON for the Purpose of Conducting the Event. ..............2

    C.  The Website is an All-Encompassing Interactive Resource for Event Participants 3

    D.  Plaintiffs' Involvement in the Cybersecurity Industry. ..........................................4

    E.  Defendants' Standalone SEVillage Became a Threat to Defendants' Business. ....5

    F.  Defendants Issued the Ban on Their Website in the Form of a Defamatory Transparency Report that Implicated Violations of the Code of Conduct at the Event.........................................................................................................6

    G.  Plaintiffs Lost Significant Business Opportunity as a Direct Result of the Defendants' Actions. ...............................................................................8

III.  DEFENDANTS' ONGOING BUSINESS ACTIVITIES IN NEVADA ARE SIGNIFICANT AND WARRANT EXERCISE OF PERSONAL JURISDICTION...10

    A.  Standard For Exercise of Personal Jurisdiction Over Out of State Defendant........10

        1.  Defendants Committed Multiple Intentional Acts Including the Series of Transactions Underlying the Event, Operating the Interactive Website, and Issuing the Defamatory Statements.........11

        2.  The Acts are Expressly Aimed at Nevada.......................................11

        3.  Defendants Knew That Plaintiff's Harm Would Occur in Nevada. 13

    B.  The Claims Arise Out of Defendants' Nevada Activities ......................................14

IV.  THE COMPLAINT'S CAUSES OF ACTION ARE PROPERLY PLEAD AND DEFENDANT'S MOTION SHOULD BE DISMISSED...........................................15

    A.  Standard of Review. .............................................................................15

    B.  Plaintiffs Have Sufficiently Plead Defamation and Business Disparagement. .......15

        1.  The Update Ratified the Public's Interpretation and Further Defamed Plaintiffs.....................................................17

        2.  Plaintiffs' Allegations Against Black Hat are Well-Pled...............18

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3.  Plaintiffs Properly Plead Business Disparagement. ........................19

C.  Plaintiffs Properly Plead Tortious Interference with Contractual Relations...........20

1.  Plaintiffs Sufficiently Pled that Defendant Knew About and Interfered with Plaintiffs' Existing Agreements with Black Hat by Defaming Them.................................................................................20

2.  Plaintiffs Sufficiently Pled that Defendant Knew About and Interfered with Plaintiffs' Ancillary Business Contracts that Make up its Core Business and at the Very Least Knew of Plaintiffs' Paid Advertised Sponsors at the Event.....................................................21

3.  The Complaint Sufficiently Pled that Defendants' Attempted to Destroy Plaintiffs' Business Reputations Because they were Rising Competitors ..................................................................................21

D.  Plaintiffs Properly Plead Tortious Interference with Prospective Contractual Relations.................................................................................................22

E.  Plaintiffs Sufficiently Plead Unjust Enrichment and Quantum Meruit...................23

F.  The Alter Ego Allegations are Well-Plead.............................................................23

G.  If the Court Grants the Motion, Leave to Amend Should be Granted ...................24

V.    CONCLUSION ..................................................................................................24

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009)................................................................................................ 15, 18, 19

4

5

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.,*
  874 F.3d 1064 (9th Cir. 2017) ............................................................................................ 11

6

7

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................................15

8

*Brainerd v. Governors of the Univ. of Alberta,*
  873 F.2d 1257 (9th Cir. 1989)… ........................................................................................10

9

10

*Branda v. Sanford,*
  97 Nev. 643… .....................................................................................................................15

11

12

*Brayton Purcell LLP v. Recordon & Recordon,*
  606 F.3d 1124 (9th Cir. 2010) ............................................................................................ 10

13

14

*Citicorp Int'l Trading Co. v. Western Oil & Refining Co.,*
  771 F.Supp. 600 (S.D.N.Y.1991) .......................................................................................23

15

*Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.,*
  213 P.3d 496 (2009) ............................................................................................................19

16

17

*Conservation Force v. Salazar,*
  646 F.3d 1240 (9th Cir. 2011) ............................................................................................15

18

19

*Foman v. Davis,*
  371 U.S. 178 (1962) ........................................................................................................... 24

20

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
  141 S. Ct. 1017 (2021) ....................................................................................................... 11

21

22

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
  564 U.S. 915 (2011)............................................................................................................10

23

24

*In re Wal–Mart Wage and Hour Emp't. Pract. Litig.,*
  490 F.Supp.2d. 1091 (D.Nev.2007) ...................................................................................23

25

*J.J. Indus., LLC v. Bennett,*
  119 Nev. 269 ................................................................................................................20, 21

26

27

*Laborers Combined Funds of Western Pennsylvania v. Ruscitto,*
  848 F.Supp. 598 (W.D.Pa.1994) ........................................................................................23

28

*Leavitt v. Leisure Sports, Inc.*,
   103 Nev. 81 ...................................................................................................22

*Keeton v. Hustler Mag., Inc.*,
   465 U.S. 770 (1984) ...............................................................13, 14, 18, 22

*Korte Constr. Co. v. State on Rel. of Bd. of Regents of Nevada Sys. of Higher Educ.*,
   137 Nev. 378 ...............................................................................................23

*Lindora LLC v. Isagenix Int'l, LLC*,
   198 F.Supp.3d 1127 (S.D. Cal. 2016) ........................................................12

*Lubin v. Kunin*,
   117 Nev. 107 ..........................................................................................16, 17

*Mavrix Photo, Inc. v. Brand Techs., Inc*,
   647 F.3d 1218 (9th Cir. 2011) ........................................................10, 12, 13

*Menken v. Emm*,
   503 F.3d 1050 (9th Cir. 2007) ...................................................................11

*Motogolf.com, LLC v. Top Shelf Golf, LLC*,
   528 F. Supp. 3d 1168 (D. Nev. 2021) *reconsideration denied*, No.
   220CV00674APGEJY, 2022 WL 834790 (D. Nev. Mar. 21, 2022) ...................22, 24

*Nevada Ind. Broadcasting v. Allen*,
   99 Nev. 404 .................................................................................................15

*Pegasus v. Reno Newspapers, Inc.*,
   118 Nev. 706 ...............................................................................................15

*Posadas v. City of Reno*,
   109 Nev. 448 ...............................................................................................15

*Rimini St., Inc. v. Oracle Int'l Corp*,
   No. 2:14-CV-1699-LRH-CWH, 2017 WL 4227939 (D. Nev. Sept. 22, 2017) ...................... 22, 23

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) .........................................................10, 12, 13

*Wealthy, Inc. v. Cornelia*,
   2023 WL 4803776 .......................................................................................13

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934, 938 (9th Cir. 2008) ..............................................................15

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
   433 F.3d 1199, 1207 (9th Cir. 2006) ..........................................................13

*Walden v. Fiore*,
  571 U.S. 277, 283 (2014) ........................................................................................................10, 11

**Statutes**

F.R.C.P. 8(a) .............................................................................................................................23

F.R.C.P. 9(b) .............................................................................................................................23

F.R.C.P. 12(b)(6) .......................................................................................................................15

F.R.C.P. 15(a) ............................................................................................................................24

Nev. Rev. Stat. § 14.065 ...........................................................................................................10

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.       INTRODUCTION

The basis of this litigation is a series of Defamatory statements about Plaintiffs Christopher Hadnagy and Social-Engineer, LLC ("Social-Engineer") that were published online by Defendants Jeff Moss and Def Con Communications, Inc. ("Def Con") to their own website at defcon.org (the "Website"). Mr. Moss is the sole creator of Def Con, the world's largest cybersecurity conference (the, "Event") that occurs annually and **only** in Las Vegas. The Website addresses truly every conceivable aspect of the Event. As the founder of this pre-eminent hacker Event, Mr. Moss' influence in the cybersecurity industry is unparalleled, as is his network. Mr. Moss goes by the moniker "The Dark Tangent" and he only accepts cash at the Event to protect attendees' personal identifiable information; the result is that all of Defendants' business income from their core product gets transacted in Las Vegas and subjects them to specific Personal Jurisdiction here. The Pennsylvania Court in the prior litigation filed by Plaintiffs could not exercise personal jurisdiction, but Hon. Beetlestone never wrote that it was to be filed in Washington, contrary to Defendants' claims. Defendants argue that personal jurisdiction should not be exercised, but they critically fail to analyze the Event as a "minimum contact" and how the defamation related thereto.

Mr. Hadnagy is the founder of Social-Engineer, his life's work, and he is currently in the fight for its survival. Mr. Moss heavily recruited Plaintiffs over the years in the development of the Event that has become one of the biggest annual conferences in Las Vegas. Mr. Hadnagy helped usher in an era of growth for the Event with his largest contribution thereto: the Social Engineering Village (the, "SEVillage"). When the SEVillage became a threat to Defendants' core business, the Event, they banned him in a public manner that destroyed the goodwill Mr. Hadnagy had fostered over his lifetime. The ban was predicated on allegations against Plaintiff that are to this day, unknown. Despite countless attempts to discuss the allegations, Mr. Moss never granted Mr. Hadnagy the opportunity to discuss them and Defendants never released any of the facts that they claimed to have considered. The Motion tries to sanitize the defamatory statements from their actual text, which cannot be done. The reading of the Transparency Report, the Code of Conduct, and the Update are crucial in understanding just how devastating it was. See Motion at Ex. 1.

1

## II.     PROCEDURAL BACKGROUND AND STATEMENT OF RELEVANT FACTS

### A.   Procedural Background.

Plaintiffs originally filed a related lawsuit in the Eastern District of Pennsylvania, which is Social-Engineer's domicile. *See Hadnagy v Moss*, No. 2:22-cv-03060-WB, ECF No. 1. However, Hon. Beetlestone ruled that Personal Jurisdiction could not be exercised under the alleged facts, which were limited to Social-Engineer's Pennsylvania client base; the Court thus dismissed the lawsuit without prejudice. *Id.* Accordingly, Plaintiffs filed this lawsuit in the Eighth Judicial District of Nevada, and promptly personally served Defendants in Nevada on August 10, 2023. ECF No. 11, pg. 2:7-8 at Ex. A. Defendants requested a 30-day extension of time to respond, which Plaintiffs granted and was reflected in the Joint Status Report. ECF No. 12, pg. 2:6-11. Thereafter, Defendants removed the Action to this Court and filed the Motion.

### B.   Mr. Moss Formed DEF CON for the Purpose of Conducting the Event.

Mr. Moss organized and founded Def Con for the purpose of conducting the annual Event in Las Vegas, Nevada every August for thirty years. Compl. ¶¶ 3, 36. The Event is exclusively held in Las Vegas and draws attendance from international and domestic government agencies and corporations seeking professional guidance on information security issues within their organizations. *Id.* ¶¶ 37, 38; see also Motion to Dismiss [ECF No. 13] ("Motion"), at 2:8-11. Mr. Moss is the Governor of Def Con and its sole founder, he conducts business at the Event every year, and is known to exert unfettered control over key aspects of Def Con, including but not limited to subject matter, recruitment, contributors, format, and scheduling of the Event. Compl. ¶¶ 2, 5, 34-35. Mr. Moss even had the power to cancel the Event during the Covid-19 outbreak; he has full power to regulate which contributors attend the Event and he wrote various "transparency reports" and the "Code of Conduct". *Id.* ¶ 5; see also Motion, at Ex. 1:003, 004, 006; see also Riklis Decl., Ex. 5 at pg. 41.

Additionally, Def Con only allows attendees of the Event to pay for their attendance in cash at the venue in Las Vegas, Nevada. Riklis Decl., Ex. 1 at pg. 02. Pursuant to the Def Con website, Def Con has collected annual cash admissions in Las Vegas, Nevada from 25,000-30,000 attendees. *Id.* pg. 03. At the current advertised price point of $440.00, that equals approximately

$11,000,000 to over $13,200,000 in cash on admissions alone. Def Con also assembles "cash-only" alcohol vending stations inside of its own Events. Riklis Decl., Ex. 6, at pg. 44.

The Def Con event itself is one of the biggest annual conventions in Las Vegas, and has reach into every perceivable aspect of society, including government, business, and law enforcement. Compl. ¶ 37.

### C.  The Website is an All-Encompassing Interactive Resource for Event Participants.

The Def Con Website is an interactive website that provides detailed instruction and archives regarding the foregoing and all remaining aspects of attendance at the Event. This is also where Def Con posted the ban of Mr. Hadnagy and Social-Engineer. See Motion, at Ex. 1. On the home page of the Def Con website, a visitor can see that the upcoming two iterations of the Event (for 2024 and 2025) already have reserved room blocks at Caesars Forum, Flamingo, Harrah's and Linq in Las Vegas, Nevada. Riklis Decl., Ex. 3 at pp. 22-23; *see also* Riklis Decl. at Ex. 1, pg. 09. The website houses multiple links to Caesars Forum, where people may book their rooms for Def Con at six different Las Vegas hotels, via a pre-inputted Event date range of August 3-August 10, 2024. Riklis Decl., Ex. 3 at pp. 24-30.

Perhaps most importantly, the Website also offers numerous forums and submissions pages for guests and members who have registered with Defcon.org to discuss all aspects of "DEF CON Conference Planning" where participants may discuss a myriad of issues pertaining to their physical presence at the conference. Riklis Decl., Ex. 2 at pp. 12-20. For Def Con 31, the 2023 iteration of the Event, there were approximately 713 separate topics. *Id.* at pg. 13. These 713 "Sub-Forums" cover logistics, questions about the physical event, and all related inquiries. *Id.* pp. 14-19. A review of these topics shows that they cover hotel recommendations, event administrative questions, and even poker tournaments scheduled for the Event. *Id.* Def Con 32 Conference planning has already begun to be populated with 3 different topics for planning. *Id.* at pg. 13. Finally, the website hosts submissions for multitudes of "calls" for participation, and even a style guide for the Event. Riklis Decl., Ex. 4 at pp. 34-38. In the "FAQ" section of the Def Con Website, Mr. Moss explains in first-person how he started the event, and that he deliberately chose

3

1   the name "Def Con" to associate with Las Vegas through code language in a movie he liked,

2   called "War Games." Riklis Decl., Ex. 1 at pg. 05.

3          In the "FAQ" section of Def Con's website, Def Con provides a protocol for foreign

4   nationals whereby it provides them with a signed invitation for submission to Government

5   authorities; where foreign nationals "require verification of housing, [Def Con] can put you in

6   touch with someone to help you get your hotel stay organized[.]" *Id.* at pg. 04. The website

7   promotes setting up a vending booth at the Event, becoming volunteer staff or so-called "Goon",

8   and even provides advice on how to avoid heat-related sickness. *Id.* at pp. 06-08; *See also* Riklis

9   Decl., Ex. 6, at pg. 44.

10         D.   **Plaintiffs' Involvement in the Cybersecurity Industry.**

11         All the parties conducted significant business in Clark County, Nevada. *Id.* ¶¶ 12, 34. Mr.

12   Hadnagy is the founder and CEO of Plaintiff Social-Engineer. Prior to the Defendants' breaches,

13   Plaintiffs regularly provided cybersecurity services to business entities in Nevada. Compl. ¶¶ 42-

14   43. In addition, Plaintiffs would enter into annual business agreements that reached six-figures of

15   compensation from another industry leader in cybersecurity, Black Hat USA ("Black Hat"). These

16   agreements required Plaintiffs to host training sessions at Black Hat's annual 6-day Cybersecurity

17   conference in Las Vegas, also held every August. *Id.* ¶¶75, 136-137. Black Hat's Las Vegas

18   conference is the focal point of what it represents is the most respected information security event

19   series internationally. *Id.* ¶ 75. Mr. Moss has been listed as Black Hat's Director since 2018, he

20   met Mr. Hadnagy in Las Vegas every year at the Black Hat event itself, and he knew of Plaintiff's

21   repeat annual engagements with Black Hat's capstone conference in Las Vegas. *Id.* ¶¶ 147-149.

22         Regarding Def Con, Mr. Moss personally encouraged Plaintiffs to attend the Event and

23   develop Def Con's most renowned events: the capture the flag game, and the unrivaled

24   "SEVillage". As alleged in the Complaint, the SEVillage was the flagship activity at the annual

25   Event: it won top awards from the National Security Administration, and achieved unrivaled draw

26   for the Event so much so that Def Con has replicated it since banning Plaintiffs. *Id.* ¶¶ 45-49, 94.

27   The SEVillage garnered such high demand that Mr. Moss changed the Event rules and granted

28   Plaintiffs permission to accept sponsorships for advertising within the SEVillage. *Id.* ¶ 50.

1   Moreover, Mr. Moss, given his unfettered control over all aspects of the Event, was aware of the

2   many commercial activities arising from the SEVillage that benefitted Plaintiffs, including but not

3   limited to displayed sponsorships and other contracts that Plaintiffs leveraged given the

4   SEVillage's successful programming. *Id.* ¶¶ 132-133.

5                    **E.  Defendants' Standalone SEVillage Became a Threat to Defendants' Business.**

6              In 2020, the Event was cancelled and Plaintiffs successfully held a standalone event to

7   serve the public's overwhelming demand for the SEVillage. The standalone conference

8   implemented substantive methodologies that Plaintiffs developed over the years. *Id.* ¶¶ 51-52. At

9   this point, it became increasingly clear that the SEVillage would be a direct competitor of

10  Defendants, a result that Mr. Moss intended to prevent. *Id.* ¶ 138.

11             In August of 2021, the Event was held in hybrid form due to Covid-related restrictions, and

12  Plaintiffs attended virtually. *Id.* ¶¶ 51, 64. Approximately one month later, Mr. Hadnagy

13  discovered that Mr. Moss was considering false and disparaging allegations allegedly regarding

14  Plaintiffs' separate business endeavors. *Id.* ¶¶ 53, 64. Plaintiffs surmised that the allegations were

15  related to Plaintiffs' attempts to secure third parties' confidential personal identifiable information

16  and prevent wrongful distribution of it pursuant to non-disclosure agreements. *Id.* From September

17  2021 through January of 2022, Mr. Hadnagy sent Mr. Moss a plethora of messages attempting to

18  schedule a meeting to discuss these false allegations, but Mr. Moss refused to grant Mr. Hadnagy a

19  meeting regarding the same. *Id.* ¶¶ 53-54. During the same time period that Defendants refused to

20  grant Mr. Hadnagy a meeting, Defendants were accepting submissions for the Event's 2022

21  contributors; it became evident that Defendants did not intend to grant a meeting with Mr.

22  Hadnagy. *Id.* ¶ 55. Accordingly, on January 22, 2022, Plaintiffs notified Defendants that they

23  would be hosting the SEVillage at another location. *Id.* 56.

24             On February 9, 2022, even though Plaintiffs had not physically participated in the Event in

25  over two (2) years, Defendants issued a surprising ban on Plaintiffs and cited violations of the

26  Event's code of conduct (the, "Code of Conduct"). *Id.* ¶ 58. See Motion, Exhibit 1.

27  / / /

28  / / /

**F.** **Defendants Issued the Ban on Their Website in the Form of a Defamatory Transparency Report that Implicated Violations of the Code of Conduct at the Event.**

Defendants announced the ban in a "Transparency Report" published on February 9, 2022:

"We received multiple [Code of Conduct] violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. **After conversations with the reporting parties and Chris, we are confident the severity of the transgressions merits a ban from DEF CON.**" (emphasis added).

Motion, Ex. 1, at 006. Compl. ¶ 58., fn. 1. (emphasis added.)  The Event's Code of Conduct is authored by Mr. Moss and states in pertinent part:

This Code of Conduct applies to everyone participating at DEF CON […] Anyone can report harassment. If you are being harassed, notice that someone else is being harassed, or have any other concerns, you can **contact a Goon, go to the registration desk, or info booth. Conference staff will be happy to help participants contact hotel security, local law enforcement, or otherwise assist those experiencing harassment to feel safe for the duration of DEF CON.**"

Compl. ¶ 60, Motion, Exhibit 1 at 002. (emphasis added.)

Critically, Defendants' Transparency Report clarifies the significance of lifetime bans, and the bans that withhold identities of accusers or details of accusations:

"Repeat offenders and those who commit more egregious offenses are permanently banned from our events. **In the case of the most troubling offenses or those who we feel may represent an ongoing risk to the community, we take the extra step of naming them publicly** […] If the report of harassment presents a risk of immediate or future retaliation, or at the request of the reporting individual, **we will take measures to protect their identity and/or details of the accusations. We've adopted these safeguards based on recommendations from the National Network to End Domestic Violence and the Violence Against Women Office at the US Department of Justice.**" Motion, Ex. 1 at 005. Compl. ¶¶ 58 fn. 1 and 63 fn. 2. (emphasis added.)

Moreover, the Transparency report explains the investigatory process wherein the "event organizers" conduct an in depth review of all allegations and consult with an attorney as needed. Motion, Ex. 1 at 005. Compl. ¶¶ 58 fn. 1 and 63 fn. 2.

Finally, the Transparency report states:

"the hotel can trespass individuals permanently banned from DEF CON, creating a criminal and physical barrier between those individuals and the conference areas[…] A DEF CON ban is a prohibition against a person or group from attending future conventions due to bad behavior. DEF CON conveys the information to the hotel and if a banned person returns they will be 'trespassed' by Hotel security and possibly prosecuted." Motion, Ex. at 008. Compl. ¶ 58 fn. 1.

Plaintiffs vehemently deny any violations of the Code of Conduct at any point in time.

1   Compl. ¶ 61. Mr. Hadnagy attempted to address any issues with Mr. Moss following the Ban

2   announcement, but Defendants ignored him, and never clarified reason for the Ban. Id. ¶ 62.

3       **<u>Due to the text of the Transparency Report and the notable fact that Defendants'</u>**

4   **<u>statements did not note any details as to how Plaintiffs allegedly violated the Code of</u>**

5   **<u>Conduct</u>**, reasonable individuals viewing the Transparency Report reasonably interpreted it to

6   mean that there were despicable facts underlying it. Id. ¶ 108. [1] Information technology and

7   security communities went ablaze across social media platforms and renowned media outlets that

8   quoted the language of the Ban and asserted that Mr. Hadnagy was a sexual predator of the worst

9   degree. Id. ¶ 66-72. Additionally, Defendants knew that the intentional presentation of the

10  Transparent Report would be reasonably understood by the public in this manner, because

11  **<u>Defendants previous lifetime bans have only been due to sexually predatory behavior</u>**.

12  Compl. ¶¶ 100-101, 103-104, 107-108. False rumors about Mr. Hadnagy spread rampantly and

13  amplified the defamatory "Transparency Report" to the point where Mr. Hadnagy's reputation had

14  been shrouded in disgrace; in an exemplary public post, he was referred to as the "Harvey

15  Weinstein" of the information security industry by an onlooker who interpreted the Transparency

16  Report in full. Id. ¶ 108. As a direct result, many of Plaintiffs' business associates assumed that

17  Mr. Hadnagy and Social-Engineer had been banned because of abhorrent findings, particularly

18  since the Event condones extreme behavior. Id. ¶ 106.

19      On January 13, 2023, Defendants refreshed, ratified, and affirmatively confirmed their

20  intent of the disparaging Transparency Report with an "update" on their website (the "Update"):

21      "During our investigation we spoke directly with Mr. Hadnagy about claims of his
        violations of our Code of Conduct. **He confirmed his behavior, and agreed to stop.**

22      **Unfortunately, the behavior did not stop** […] Our investigation also revealed that DEF
        CON is not the only security conference to receive complaints about Mr. Hadnagy's

23      behavior. **For example, Black Hat received complaints, conducted their own**

24  _____

25  [1] According to the article cited to in the Complaint, Plaintiff Hadnagy, "an influential figure at the
    DEF CON security conference, was permanently banned following allegations of misconduct at
    the annual Las Vegas gathering." **Notably, the article specifically states that no specifics about**

26  **the violations were provided by Defendants**. *https://www.techtarget.com/searchsecurity/news/
    252513274/DEF-CON-bans-social- engineering- expert-Chris-Hadnagy.*

27

28

                                        7

**investigation and removed Mr. Hadnagy from their Review Board.**"

*Id.* ¶¶ 80, 98. Mr. Hadnagy never confirmed any alleged behavior, as Defendants refused to meet

with him or provide him with any information regarding the allegations despite his extensive

attempts to obtain the same. *Id.* ¶¶ 61-62, 84. This defamation and intentional interference

perpetrated by Defendants was expressly directed at and related to the Event and the parties'

continuous activities in Las Vegas. Compl. ¶ 11. The majority of Plaintiffs' prior business

associates in Las Vegas, including Black Hat have terminated their contracts with Plaintiffs and

stated that they did so as a direct result of Defendants' statements. Compl. ¶¶ 42-43.

### G. Plaintiffs Lost Significant Business Opportunity as a Direct Result of the Defendants' Actions.

Immediately after the damning Transparency Report was posted, Plaintiffs' clients began

to terminate their relationships with Plaintiffs specifically citing the "Transparency Report."

Compl. ¶¶ 73-76. Mr. Moss also published these defamatory statements in private to other industry

leaders who host similar annual conventions in Las Vegas, Nevada. *Id.* ¶ 113. The Complaint

alleges that Mr. Moss spread additional Injurious Falsehoods to organizers of Black Hat, including

that Plaintiffs' employment practices were racially discriminatory and that Mr. Hadnagy fosters a

hostile work environment based on gender. *Id.* This was aimed at Plaintiffs' operations, services,

business reputations, and clients. The Complaint alleges as follows:

> "73. Immediately after the publication of the "Transparency Report" and the uproar in the business community, actual and potential clients of PLAINTIFFS began to terminate their relationships and contracts with PLAINTIFFS, specifically citing the "Transparency Report" published by DEFENDANTS. These engagements included but are not limited to teaching engagements, speaking engagements, and long-term business service agreements.

> 74. A plethora of both PLAINTIFFS' clients and potential clients have refused to do business with PLAINTIFFS since the defamatory statements were published.

> 75. The cancelled engagements include other Nevada-based Cybersecurity conferences such as a 6-day Cybersecurity conference hosted annually by Black Hat USA ("Black Hat") in Las Vegas, Nevada. Black Hat's Las Vegas convention is the focal point of what Black Hat's website represents is the most respected information security event series internationally. PLAINTIFFS were regular participants in Black Hat's conference at which they conducted classes for significant monetary compensation, sometimes reaching into the six-figure range.

> 76. In or about February of 2022, Black Hat's representatives issued a ban of PLAINTIFFS from Black Hat's conference, specifically in light of DEFENDANTS' publishing of the "Transparency Report" and the online aftermath thereof."

Comp. ¶¶ 73-76.

Additional averments in the Complaint state that Mr. Moss is a Director of Black Hat and that Plaintiffs have been informed that Mr. Moss published the transparency report and other false reports to other representatives of Black Hat in order to exact a definitive blow to Plaintiffs and prevent their expansion of the SEVillage. *Id.* ¶ 78. The Complaint further alleges:

> "On information and belief, these false defamatory statements (the, "Injurious Falsehoods") included, but were not limited to, the following:
>
>> a.  Plaintiff HADNAGY perpetrated repeated sexual harassment against various victims, as an individual, and as the Chief Executive Officer of Plaintiff SOCIAL-ENGINEER (the, "Acts").
>> b.  The Acts were severe and repugnant.
>> c.  DEFENDANTS determined that the Acts occurred based upon their purported investigation and evidence presented.
>> d.  DEFENDANTS confronted Plaintiff HADNAGY with the subject allegations and he both admitted to the Acts, and stated that he would cease the Acts.
>> e.  Despite his representations to the contrary, Plaintiff HADNAGY continued the Acts, and was thereon banned from the Event.
>> f.The "Transparency Report" published by Defendant MOSS to Defendant DEF CON's website on February 9, 2022.
>> g.  The Update to the "Transparency Report" published by Defendant MOSS to Defendant DEF CON's website on January 13, 2023.
>
> 79. As a direct result of DEFENDANTS' false, defamatory statements, Plaintiffs are informed, believe, and thereon allege that Black Hat removed Plaintiff HADNAGY from its prestigious Review Board, and banned PLAINTIFFS from the Black Hat convention in Las Vegas, Nevada."

Comp. ¶¶ 78-79. **These allegations are plausible and supported by reasonable interpretations of the full text of the Transparency Report, the Code of Conduct, and the Update.** *Id.*

The disparaging remarks that Defendants published were intended to destroy Plaintiffs' reputations, which are paramount in the information security industry. Comp. ¶¶ 81, 88. Defendants' specific intent was to entangle Plaintiffs' valuable reputations in controversy in light of Plaintiffs' efforts to conduct its standalone version of the SEVillage; Defendants were motivated by ill-will and revenge in ensuring that they prevent the SEVillage from independent success. *Id.* ¶¶ 88, 114. In fact, Defendants were so calculated in that they benefitted from Plaintiffs' injury by replacing the SEVillage with a replica event that was meant to attract the same audience that Plaintiffs cultivated for years; this replica is even called the "Social Engineering Community Village." *Id.* ¶¶ 94, 140.

9

Several of Plaintiffs' other longstanding clientele with offices in Las Vegas stated specifically the reason behind the termination of their contracts with Plaintiffs were their interpretation of the Ban and the subsequent Update thereto. *Id.* ¶¶ 86, 89, 90, 99.

### III.   DEFENDANTS' ONGOING BUSINESS ACTIVITIES IN NEVADA ARE SIGNIFICANT AND WARRANT EXERCISE OF PERSONAL JURISDICTION

#### A.   Standard For Exercise of Personal Jurisdiction Over Out of State Defendant.

Specific personal jurisdiction may be exercised here since these claims arise out of the Event as an "activity or an occurrence that takes place in [or is purposely directed at] the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). This is a "defendant-focused" inquiry. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Nevada law governs this jurisdictional issue. *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1258 (9th Cir. 1989). Nevada's long-arm statute grants jurisdiction "on any basis not inconsistent with" the U.S. Constitution thus the jurisdictional analyses under state and federal due process are identical. *See id.*; Nev. Rev. Stat. § 14.065.

Moreover, "[w]here, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (citing *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)). Additionally, "uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal citations and quotations omitted) and factual disputes must be resolved in favor of the plaintiff. *Id.*

The 9th Circuit applies a three-part test to determine if a [non-resident] defendant has sufficient minimum contacts to be subject to specific personal jurisdiction:

> "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof [. . .];
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Schwarzenegger*, 374 F.3d at 802. If the plaintiff satisfies the first two prongs, the burden will

1   shift to the defendant to show that exercising jurisdiction would be unreasonable. *Menken v. Emm*,

2   503 F.3d 1050, 1057 (9th Cir. 2007). Where, as here, a case sounds in tort, the court employs the

3   purposeful direction test. *Id.* Under the purposeful direction analysis, district courts consider

4   whether the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state,

5   (3) causing harm that the defendant knows is likely to be suffered in the forum

6   state." *Schwarzenegger*, 374 F.3d at 803.

7           1.   <u>Defendants Committed Multiple Intentional Acts Including the Series of
            Transactions Underlying the Event, Operating the Interactive Website, and</u>

8           <u>Issuing the Defamatory Statements.</u>

9           Minimum contacts "must show that the defendant deliberately reached out beyond its

10   home – by, for example, exploiting a market in the forum State or entering a contractual

11   relationship centered there." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017,

12   1025 (2021) (internal citations and quotations omitted). There is no question that Defendants have

13   satisfied this requirement with multiple, continuous, and systematic intentional acts directed at

14   exploiting the market in Nevada for over thirty consecutive years. Defendants reasonably have

15   substantial agreements with Nevada residents in order to secure Event space, obtain insurance for

16   the Event, and provide hotel reservation blocks for attendees of the Event. Importantly,

17   Defendants consummate 25,000-30,000 annual cash transactions in Las Vegas. The publishing of

18   the Website are inextricably connected to the Event and expressly apply to attendees of the Event

19   **in Nevada**. This includes the Code of Conduct, the Transparency Report, and the Update which

20   refer the readers to local authorities and law enforcement. Motion, Ex. 1 at 005-006, and 008.

21           2.   <u>The Acts are Expressly Aimed at Nevada.</u>

22           When determining whether the defendant expressly aimed its conduct at the forum state,

23   the court focuses on "**the defendant's contacts with the forum State itself, not the defendant's**

24   **contacts with persons who reside there**." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d

25   1064, 1070 (9th Cir. 2017) (quoting *Walden*, 571 U.S. at 284)(emphasis added.) Here it is clear on

26   the face of the Complaint that Defendants' conduct in publishing the Transparency Report, the

27   Code of Conduct, and the Update all had an effect in the forum state because they were meant to

28   govern the Event.

1    "[O]perating 'a passive website alone cannot satisfy the express aiming prong,' but doing

2    so in conjunction with 'something more—conduct directly targeting the forum—is

3    sufficient.'" *Mavrix*, 647 F.3d at 1229. "In assessing whether a defendant has done 'something

4    more,' courts consider several factors, including 'the interactivity of the defendant's website, the

5    geographic scope of the defendant's commercial ambitions, and whether the defendant

6    individually targeted a plaintiff known to be a forum resident.'" *Lindora LLC v. Isagenix Int'l,*

7    *LLC*, 198 F.Supp.3d 1127, 1139 (S.D. Cal. 2016) (quoting *Mavrix*, 647 F.3d at 1229). If, when

8    considering these factors and Defendant's other conduct, it can be said that Defendant

9    "continuously and deliberately exploited the California market for its website," jurisdiction is

10   proper. *Mavrix*, 647 F.3d at 1229.

11   Here, Defendants' website clearly targets and exploits the hospitality economy in Las

12   Vegas, Nevada which is one of Nevada's most prominent markets. The website is extremely

13   interactive and assists its visitors specifically with regard to every aspect of the annually

14   reoccurring Event. Between the hundreds of online sub-forums for the Website's guests and

15   registered users to discuss their participation at the Event, to the entire recruitment section on the

16   Website, there is a trove of real time information for interested individuals who will be attending

17   the Event. The website also provides a room block for the Event, and it facilitates every

18   conceivable aspect of the Event, even international Visa support for attendees.

19   The geographic scope of Defendants' main commercial ambitions is necessarily limited to

20   Nevada because the only place where attendees can purchase their admission is in Las Vegas,

21   Nevada. The *Mavrix* Court found the geographic scope of commercial ambitions to be the most

22   salient factor in their "express direction" analysis. *Id.* at 1229. Moreover, the *Mavrix* Court held

23   that specific jurisdiction was warranted based on defendants' intent to exploit the California

24   market for its own commercial gain. *Id.*  In *Mavrix*, the Court stated:

25   "[I]t is clear from the record that [defendant] operated a very popular website with a
         specific focus on the California—centered celebrity and entertainment industries. Based on
26   the website's subject matter, as well as the size and commercial value of the California
         market, we conclude that Brand anticipated, desired, and achieved a substantial California
27   viewer base. This audience is an integral component of Brand's business model and its
         profitability."

28

1    *Id.* at 1230. Here, it is clear that Defendants' commercial ambitions were to operate an annual

2    convention in Las Vegas. As in *Mavrix*, attendees to the annual convention are the integral

3    component of Defendants' business model and profitability. The Event is explicitly Def Con's

4    main business operation, it only ever happens in Las Vegas, and one can only ever purchase a

5    ticket in Las Vegas. That means that all of Def Con's business income for its main commercial

6    segment is transacted in 25,000-30,000 separate transactions in Las Vegas, Nevada. Thus, it is

7    clear that the geographical ambitions of Def Con are limited to the hospitality and entertainment

8    industries in Nevada.

9        Defendants' errantly claim that personal jurisdiction cannot be exercised since no party is

10   domiciled in Nevada, and since the statements published online had "nothing more than an

11   incidental connection in Nevada." Motion at 7:7-9. However, this entirely ignores the controlling

12   law. As a result, the Defendants have drawn a false equivalency with *Wealthy, Inc. v. Cornelia*,

13   2023 WL 4803776, which has an appeal pending. In *Wealthy*, the Court examined statements

14   recorded in Brazil and intended to be disseminated worldwide via YouTube. *Id.* at *3-4. The court

15   in *Wealthy* noted that the defendant was never physically present in Nevada during the relevant

16   time period. *Id.* To the contrary, the Defendants have been systematically present in Nevada and

17   they published the disparaging statements on the Website. Indeed, the Court in *Wealthy* did not

18   even need to examine the allegations under the factors set forth in *Mavrix*, because the website

19   was Youtube, a third-party site that is not specifically aimed at Nevada. *Mavrix*, 647 F.3d at 1229.

20        3.   Defendants Knew That Plaintiff's Harm Would Occur in Nevada.

21        Defendants knew that the harm would be caused in Nevada because this is the only place

22   where the Event is held. The Ninth Circuit has followed *Keeton* in this context. See *Yahoo! Inc. v.*

23   *La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006); see also

24   *Schwarzenegger*, 374 F.3d at 803 (describing *Keeton* as a purposeful direction case). In *Keeton*, a

25   plaintiff resident of New York sued Hustler magazine, an Ohio corporation, for libel in New

26   Hampshire based on the circulation in New Hampshire of copies of the magazine that contained

27   the allegedly libelous material. *Keeton v. Hustler Mag., Inc.,* 465 U.S. 770, 772 (1984). Hustler

28   circulated 10,000–15,000 copies of per month in New Hampshire, but had no other contacts with

the forum. *Id.* at 772. The *Keeton* Court stated that Hustler was "carrying on a 'part of its general business' in New Hampshire, and that is sufficient to support jurisdiction when the cause of action arises out of the very activity being conducted, in part, in New Hampshire." *Id.* at 779–80. Finally, the Court specified that "[Hustler] produces a national publication aimed at a nationwide audience. There is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Id.* at 781. The *Keeton* Court stated:

> "It is undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire. But that will be true in almost every libel action brought somewhere other than the plaintiff's domicile. There is no justification for restricting libel actions to the plaintiff's home forum."

*Id.* at 780–81.

 Here, it is clear that the ground zero of the devastating effects of Defendants' disparaging statements would be in Nevada because defamatory statements were intended to be processed by all annual participants at the Event. As such, the harm was likely to be felt here.

## B.  The Claims Arise Out of Defendants' Nevada Activities.

This lawsuit involves defamation, intentional interference with contractual relations, and related equitable claims. Defendants published defamatory statements to the Website about Plaintiffs relating to the Event, implying that Mr. Hadnagy committed despicable behavior at the same. Defendants errantly claim that Nevada has no interest in "a case of online defamation between nonresident plaintiffs and nonresident defendants with nothing more than a passing connection to Nevada." Motion at 8:9-11. This is false. Per *Keeton*:

> "This interest extends to libel actions brought by nonresidents. False statements of fact harm both the subject of the falsehood *and* the readers of the statement. New Hampshire may rightly employ its libel laws to discourage the deception of its citizens. There is 'no constitutional value in false statements of fact.'" *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984)(emphasis in original.)

*Keeton* addresses Defendants' red-herring argument that Plaintiffs are not residents of Nevada: "we have not to date required a plaintiff to have 'minimum contacts' with the forum State before permitting that State to assert personal jurisdiction over a nonresident defendant." *Id.* at 771.

/ / /

14

IV.    **THE COMPLAINT'S CAUSES OF ACTION ARE PROPERLY PLEAD AND DEFENDANT'S MOTION SHOULD BE DISMISSED.**

A.  **Standard of Review.**

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[T]he motion [to dismiss] is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citation omitted).

B.  **Plaintiffs Have Sufficiently Plead Defamation and Business Disparagement.**

The standard of a defamation claim require a plaintiff to plead: "(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 718. A defamatory statement "would tend to lower the subject in the estimation of the community". *K-Mart Corporation v. Washington*, 109 Nev. 1180, 1191. The Court resolves the question of "whether a reasonable person would be likely to understand the remark as an expression of the source's opinion or as a statement of existing fact." *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 715; (citing *Nevada Ind. Broadcasting v. Allen*, 99 Nev. 404, 410). Where a statement is susceptible of multiple interpretations, one of which is defamatory, the resolution of this ambiguity is left to the finder of fact. *Posadas v. City of Reno*, 109 Nev. 448, 453. Moreover, the words must be reviewed in their entirety and in context to determine whether they are susceptible of defamatory meaning. *Branda v. Sanford*, 97 Nev. 643, 646-47 ("words do not exist in isolation.") The Complaint alleges that Defendants published various defamatory statements to third parties. They include: 1) the Transparency Report and Code

1  of Conduct; 2) the Update, and 3) the Injurious Falsehoods.

2      First, the Transparency Report is defamatory. Viewing the entire Transparency Report

3  section of the Website, a reasonable person would lower their view of Plaintiffs. The Transparency

4  report: i) claimed that the severity of the transgressions merits a ban of Plaintiffs; and ii) provided

5  no detail regarding the allegations, a fact noted separately in the article published by

6  techtarget.com. The Transparency Report readily clarifies the significance of lifetime bans and the

7  providing of no details in a transparency report, and how Defendants publish them:

8      **"Repeat offenders and those who commit more egregious offenses are permanently
       banned from our events. In the case of the most troubling offenses or those who we
9      feel may represent an ongoing risk to the community, we take the extra step of
       naming them publicly.** [….] If the report of harassment presents a risk of immediate or
10     future retaliation, or at the request of the reporting individual, we will take measures to
       protect their identity and/or details of the accusations. **We've adopted these safeguards
11     based on recommendations from the National Network to End Domestic Violence and
       the Violence Against Women Office at the US Department of Justice."**

12  Motion, Ex. 1 at 005. Compl. ¶¶ 58 fn. 1 and 63 fn. 2. (emphasis added.)

13     The facts at bar are comparable to those in *Lubin v. Kunin*, 117 Nev. 107, 112. In *Lubin*,

14  plaintiff Dr. Lubin was the director of a private Hebrew school in Las Vegas who filed a

15  defamation claim against a parent coalition (the "Parents"). *Id.* at 109. The defamation claim arose

16  from the Parents' distribution of a handout describing a lawsuit filed against Dr. Lubin in 1996

17  that involved in pertinent part child abuse, assault, battery, and negligence. Id. The handout stated:

18     ***This is not a frivolous law suit there is an abundance of evidence as well as eye-
       witnesses.*** These parents never envisioned that anything of this nature could or would
19     happen to their child. **IT DID!** It is time to protect our children.

20  *Id.*, at 110 (emphasis in original.) The Court concluded that the Parents' statement of "IT DID!"

21  was susceptible of two interpretations, one which was defamatory. *Id.* The *Lubin* Court states that

22  in "certain contexts, however, a statement may be ambiguous or a 'mixed type,' which is 'an

23  opinion, which gives rise to the inference that the source has based the opinion on underlying,

24  undisclosed defamatory facts.' [….] whether it is a fact or evaluative opinion is left to the jury.'"

25  *Lubin v. Kunin*, 117 Nev. 107, 112-113. The Court focused on the Parents' statement that the

26  lawsuit was "not frivolous" and was "supported by abundant evidence." *Id.* The Court concluded:

27  "It is thus arguable that the Parents were implying by their statements the existence of factual

28

1    information rather than opinion that would prove the allegations against Lubin." Id.

2         This same rationale can be implied to the facts at bar with further force. Defendants did not

3    just "ban" Plaintiffs on their website, but they set forth disparaging statements about their claimed

4    investigation of underlying allegations regarding the Event's Code of Conduct. Moreover,

5    Defendants "implied by their statements the existence of factual information rather than opinion".

6    *Lubin*, 117 Nev. at 112. Specifically, the Transparency Report stated that they had discussions

7    with all parties involved and were confident that the severity of the transgressions merited the ban

8    from DEF CON. The significance of a named ban is damning in conjunction with the fact that Def

9    Con **withheld all details that they could claim to have known regarding the allegations**. That

10   is clearly indicative of the standard that they adopted "**based on recommendations from the**

11   **National Network to End Domestic Violence and the Violence Against Women Office at the**

12   **US Department of Justice.**" See Motion, Ex. 1 at 005. Compl. ¶¶ 58 fn. 1 and 63 fn. 2. (emphasis

13   added.) Since Mr. Hadnagy was named, Defendants confirm their position that he committed the

14   most troubling offenses and/or is an ongoing risk to the community. The Transparency Report

15   even touts how thorough Defendants' investigations of claims are, and that Defendants usually

16   consult their attorney, potential witnesses, "alleged offender(s), and victim(s)." Motion, Ex. 1 at

17   005; Compl. ¶¶ 58 fn. 1 and 63 fn. 2. As in *Lubin*, Defendants "were implying by their statements

18   the existents of factual information rather than opinion that would prove the allegations against

19   [Plaintiffs]" and thus the Court must deny the Motion to Dismiss.

20        1.   The Update Ratified the Public's Interpretation and Further Defamed Plaintiffs.

21        The Update was published almost one entire year after the original Ban was announced and

22   ratified the public's interpretation of the Ban being one resulting from sexual misconduct. Despite

23   Defendants clear knowledge of Plaintiffs' claims of defamation and the public's verdict based

24   upon the same, the Update did not seek to clarify the uproar and stated:

25        "During our investigation we spoke directly with Mr. Hadnagy about claims of his
         violations of our Code of Conduct. He confirmed his behavior, and agreed to stop.
26       Unfortunately, the behavior did not stop […] Our investigation also revealed that DEF
         CON is not the only security conference to receive complaints about Mr. Hadnagy's
27       behavior. For example, Black Hat received complaints, conducted their own investigation
         and removed Mr. Hadnagy from their Review Board."

28

17

1   Motion, Ex. 3 at 018, Compl. ¶¶ 80, 98.

2        This Update is independently actionable given the timeline of the alleged facts. Plaintiffs

3   allege that they first discovered the alleged defamatory rumblings in September of 2021 and were

4   banned the following February. *Id.* ¶ 51, 58, 64. Between September and February, there were no

5   Events, and Plaintiffs did not have the chance to "not stop" whatever "behavior" they were being

6   accused of in relation to the Event. Defendants never provided Plaintiffs with an opportunity to

7   discuss the allegations. *Id.* ¶¶ 61-62, 84. It is thus abundantly clear that the Update contained a

8   false statement of fact riddled with a disparaging effect. Defendants even decided to separately

9   name Black Hat, which had never announced any such ban. It is clear that they had intent to stoke

10  the public uproar and transmit it across all Nevada-based cybersecurity conferences.

11       Defendants' meanderings about causation and first-amendment rights completely sanitize

12  the facts at bar from the actual statements made. The argument merely focuses on the fact of the

13  ban itself, which does not comport with Nevada law. These arguments are also dispelled by the

14  Supreme Court's statements in *Keeton*: "There is 'no constitutional value in false statements of

15  fact.'" *Keeton*, 465 U.S. at 776 (1984)(emphasis in original.)

16       Plaintiffs distinguish between the harm that Defendants caused as opposed to false rumors.

17  Plaintiffs set forth extensive allegations regarding Defendants' attempts to spread the Injurious

18  Falsehoods to "other key leaders in the Cybersecurity industry". Compl. ¶¶ 76-79, 82, 112-113,

19  136, 149, 151. The only culpable parties here are Defendants, and they are such because no one

20  else, not even Black Hat issued any alleged "public ban". Accordingly, the harm was solely based

21  on Defendants' Transparency Report, and the Update.

22            2.   Plaintiffs' Allegations Against Black Hat are Well-Pled.

23       Defendants have pointed to inapplicable law to support the argument that the Black Hat-

24  specific allegations are not plausible. Plaintiffs must provide "sufficient factual matter, accepted as

25  true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, supra, 556 U.S. at

26  678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

27  to draw the reasonable inference that the defendant is liable for the misconduct

28  alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will ... be a

1  context-specific task that requires the reviewing court to draw on its judicial experience and

2  common sense." *Id.* at 679.

3      One need not look further than a full reading of the Transparency Report, the Code of

4  Conduct, and the Update to understand how the "information and belief" fills in gaps on the exact

5  timeline. Nonetheless, all the necessary facts are there. Plaintiffs have been informed that Mr.

6  Moss published the transparency report and other false reports to representatives of Black Hat in

7  order to exact a definitive blow to Plaintiffs and prevent their expansion of the SEVillage. Compl.

8  ¶ 78. Since Black Hat never issued an alleged "public ban", how else could have Plaintiffs

9  discovered the rationale provided by Black Hat? Only by Black Hat specifically stating this to

10  them, as they did pursuant to the Complaint.

11      The case law that Defendants cite to in furtherance of their challenge to these allegations

12  involve pleadings that merely recited elements of the claims "on information and belief". See

13  Motion, 12:25-13:5. They are thus distinguishable because those allegations were conclusory and

14  a "formulaic recitation of the elements" of the claim. *Id.* The *Miller* Court also stated: "The Court

15  recognizes that 'information and belief' pleading is allowed—indeed, necessary at times." *Id.*

16  Aside from the Defendants' Transparency Report and Update thereto, the exact time of when Mr.

17  Moss published the Injurious Falsehoods to Black Hat is not entirely clear. However, the

18  allegations are clearly plausible and the Motion must be denied.

19          3.  <u>Plaintiffs Properly Plead Business Disparagement.</u>

20      Finally, Plaintiffs properly plead a claim for Business Disparagement pursuant to *Clark*

21  *Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 504 (2009). To state claim for

22  business disparagement, a plaintiff must allege: "(1) a false and disparaging statement, (2) the

23  unprivileged publication by the defendant, (3) malice, and (4) special damages." For similar

24  reasons explained above, these claims satisfy these elements. Additionally, the complaint

25  specifically alleges that the disparaging remarks that Defendants published were intended to

26  destroy Plaintiffs' reputations, which are paramount in the information security industry. Compl.

27  ¶¶ 81, 88. Moreover, the Complaint alleges that Mr. Moss spread additional Injurious Falsehoods

28  to Black Hat, including that Plaintiffs' employment practices were racially discriminatory and that

Mr. Hadnagy fosters a hostile work environment based on gender. *Id.* ¶ 76.

### C. **Plaintiffs Properly Plead Tortious Interference with Contractual Relations.**

In an action for intentional interference with contractual relations, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 274. The plaintiff must demonstrate that the defendant knew of the existing contract, or establish "facts from which the existence of the contract can reasonably be inferred." *Id.* Moreover, "the inquiry usually concerns the defendant's ultimate purpose or the objective that he or she is seeking to advance." *J.J. Indus.* 119 Nev. at 275–76. The Complaint sufficiently pleads the cause of action for intentional interference with three (3) separate series of contractual relations: 1) Plaintiffs' agreement with Black Hat; 2) Plaintiffs' Sponsorship agreements at the Event; and 3) Plaintiffs' ancillary business contracts that make up its core business which were interfered with due to the reach of Defendants' defamation.

#### 1. Plaintiffs Sufficiently Pled that Defendant Knew About and Interfered with Plaintiffs' Existing Agreements with Black Hat by Defaming Them.

Defendants pled that they entered into substantial annual agreements with Black Hat to conduct training sessions at Black Hat's conference in Las Vegas. Compl. ¶¶ 75, 136-137. Mr. Moss has been listed as Black Hat's Director since 2018, he met Mr. Hadnagy in Las Vegas every year at the Black Hat event itself, and he knew of Plaintiff's repeat annual agreements with Black Hat's capstone conference in Las Vegas. *Id.* ¶¶ 147-149. Given his directorship at Black Hat, it would be hard to imagine Mr. Moss not being able to infer that Mr. Hadnagy at least reasonably was consistently entering into large contracts with Black Hat for his trainings. Moreover, Plaintiffs allege specific conduct of Defendants designed to disrupt these agreements including the publishing of the Injurious Falsehoods, which are all derived from Mr. Moss' intimate ties with Black Hat and his publishing of the Transparency Report, the Code of Conduct, and the Update. Compl. ¶¶ 78-79. To dispel any doubt as to their intent, Defendants broadcasted links to the Transparency Report and the Update on their X account (formerly known as "Twitter") to their

more than four hundred thousand followers and other key industry leaders. Compl. ¶¶ 111-112.

        2.   <u>Plaintiffs Sufficiently Pled that Defendant Knew About and Interfered with Plaintiffs' Ancillary Business Contracts that Make up its Core Business and at the Very Least Knew of Plaintiffs' Paid Advertised Sponsors at the Event.</u>

Mr. Moss exerts unfettered control over key aspects of Def Con given his position as its sole founder and Governor. Compl. ¶¶ 2, 5, 34-35. Even though Def Con is the epicenter of the information security industry, Mr. Moss' reach goes beyond just Def Con; as alleged, he is also a Director at Black Hat, and he has great exposure as a result of leadership roles related to these quintessential cybersecurity events. Given this far-reaching influence and his attendance at these events for business, it follows that he must plausibly know the various business relationships that affect his key contributors. It is not debated that Plaintiffs' contributions to the Event were without comparison given the popularity of the SEVillage and Mr. Hadnagy. Compl. ¶¶ 45-50, 94. Mr. Moss, with complete authority over who enters and leaves the Event would reasonably be expected to know about Mr. Hadnagy's key business partners given that one of the main purposes of hosting a convention is to create collaborative relationships that may result in business. At the least, Defendants were aware who Plaintiffs' advertised sponsors at the Event. *Id.* ¶¶ 50, 132-133.

        3.   <u>The Complaint Sufficiently Pled that Defendants' Attempted to Destroy Plaintiffs' Business Reputations Because they were Rising Competitors.</u>

Plaintiffs sufficiently allege facts as to motive pursuant to *J.J. Indus., LLC v. Bennett*, 119 Nev. 269 at 275–76. Compl. ¶¶ 44-49, 50, 94. For the months that Defendants completely disregarded Plaintiffs' attempts to clear up any false allegations, it became very clear that Defendants' were not interested in Plaintiffs' side of any story. Accordingly, Plaintiffs finally notified Defendants that they would not be attending the Event. The Transparency Report was posted three weeks after, even though Mr. Hadnagy had been attempting to discuss the allegations Mr. Moss for approximately five (5) months prior. This timeline suggests that Defendants made a swift retaliatory move against Plaintiffs after stringing them along for months.

Even more disturbing is that the Update claims that Defendants spoke with Mr. Hadnagy, who allegedly confirmed his behavior, and agreed to stop. This is false and even impossible as discussed above, there were no Events in that period of time. Accordingly, the false nature of the

Mr. Moss' intent to defame Plaintiffs and destroy their business becomes more than plausible.

### D. **Plaintiffs Properly Plead Tortious Interference with Prospective Contractual Relations.**

Pleading intentional interference with prospective economic advantage requires: (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct. *Leavitt v. Leisure Sports, Inc.,* 103 Nev. 81, 88. The difference in analysis of this claim and the prior one for interference is that the contractual relations with Plaintiffs need to be alleged as prospective versus already established. *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1178 (D. Nev. 2021), *reconsideration denied*, No. 220CV00674APGEJY, 2022 WL 834790 (D. Nev. Mar. 21, 2022)(stating "the Supreme Court of Nevada would find alleging a certain class of prospective customers without identifying them specifically is sufficient to state a claim for intentional interference with prospective economic advantage."). Here, Plaintiffs identified multiple groups of potential customers that Defendants knew of. These include Black Hat, ancillary business agreements that Plaintiffs had for long-term services, and also agreements that controlled the sponsorships that they would benefit from at the Event. Thus, they are sufficiently pled.

Defendants mistakenly claim that they had a first amendment privilege to ban Mr. Hadnagy pursuant to *Leavitt v. Leisure Sports, Inc.,* 103 Nev. 81, 88. In *Leavitt*, the relevant conduct involved a party's announcement of a previously recorded claim at a trustee sale and the Court agreed that a party can have privilege where protecting a property interest that they acquired via valid contract. *Id.* at 85, 89. In this matter, however, Defendants argument that there was some privilege connected with a first amendment right to assemble related to "protecting their own business interests", unsupported. Motion at 19:22-25; *See Keeton*, *supra,* 465 U.S. 770, 776.

Finally, Defendants errantly invoke an unreported case to support their thought that Plaintiffs did not allege that they "would have been awarded the contract but for the defendant's interference." *Rimini St., Inc. v. Oracle Int'l Corp.,* No. 2:14-CV-1699-LRH-CWH, 2017 WL

22

4227939 (D. Nev. Sept. 22, 2017). However, it is clear that Plaintiffs allege in multiple different

fashions that they were told the specific reason for ending negotiations was the Def Con ban.

### E.  **Plaintiffs Sufficiently Plead Unjust Enrichment and Quantum Meruit.**

To successfully plead an unjust enrichment claim, a plaintiff needs to show that they

conferred a benefit on the defendant, the defendant appreciated such benefit, and there is

acceptance and retention by the defendant of such benefit under circumstances such that it would

be inequitable for him to retain the benefit without payment of the value thereof. *Certified Fire*

*Prot., Inc. v. Precision Constr., Inc.*, 128 Nev. 371, 381, 283 P.3d 250, 257 (2012). Benefit

"**denotes any form of advantage**." *Korte Constr. Co. v. State on Rel. of Bd. of Regents of Nevada*

*Sys. of Higher Educ.*, 137 Nev. 378, 381, (2021)(Emphasis Added.). Defendants misconstrue

Plaintiffs' expectation of payment here to mean payment from Defendants derived from the

performance of services for Defendants. Here, it is clear that Plaintiffs contributed greatly to the

growth of the Event at the request of Defendants. Compl. ¶¶ 44-46, 50, 58, 94, 133, 140, 163.

Defendants then wrongfully harnessed all the benefits and goodwill that Plaintiffs developed over

the years through substantial efforts. *Id.* Surely, Plaintiffs business has been decimated.

Accordingly, this alternative theory of relief was plead correctly. To succeed on a claim for

quantum meruit, a plaintiff must show that it conveyed a benefit on the defendant and the

defendant appreciated, accepted and retained the benefit under the circumstances such that it

would be inequitable for him to retain the benefit without paying for it. *In re Wal–Mart Wage and*

*Hour Emp't. Pract. Litig.,* 490 F.Supp.2d. 1091, 1125 (D.Nev.2007).  The unjust enrichment

analysis applies here and the Motion should be denied.

### F.  **The Alter Ego Allegations are Well-Plead.**

The alter ego allegations will not be held to the particularity requirement of Fed.R.Civ.P.

9(b), because there are no allegations of fraud imputed into them. *See Citicorp Int'l Trading Co. v.*

*Western Oil & Refining Co.,* 771 F.Supp. 600, 608 (S.D.N.Y.1991); *Laborers Combined Funds of*

*Western Pennsylvania v. Ruscitto,* 848 F.Supp. 598, 600–01 (W.D.Pa.1994) (Rule 8(a) applies

to alter ego allegations "unless fraud is a necessary element of the claim"). Alternatively, the

Court can invoke the exception to this standard because the alleged information is in the

1  defendants' "exclusive control." *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d

2  1168, 1177 (D. Nev. 2021), *reconsideration denied*, No. 220CV00674APGEJY, 2022 WL 834790

3  (D. Nev. Mar. 21, 2022).

4  **G.  If the Court Grants the Motion, Leave to Amend Should be Granted.**

5  The court should "freely give" leave to amend when there is no "undue delay, bad faith or

6  dilatory motive on the part of the movant ... undue prejudice to the opposing party by virtue of

7  allowance of the amendment, [or] futility of amendment." Fed.R.Civ.P. 15(a); *Foman v.*

8  *Davis,* 371 U.S. 178, 182 (1962). While Plaintiffs maintain the Complaint was plead in accordance

9  with Federal standards, it was originally filed in the Eighth Judicial District Court and Plaintiffs

10  did not include certain identifying information pertaining to various agreements that were

11  interfered with and disparaging statements in order to avoid further harming any of Plaintiff's

12  business relationships.

13  **V.     CONCLUSION**

14  For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants'

15  Motion to Dismiss in its entirety.

16  DATED: October 16, 2023                    Respectfully submitted,

17                                             **RIKLIS LAW, PLLC**

18

19                                   By:  _____*kristofer Riklis*_____

20                                         Kristofer Riklis
                                           Attorney for CHRISTOPHER J. HADNAGY and
21                                         SOCIAL-ENGINEER, LLC

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Kristofer Riklis, hereby certify that the foregoing:

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM [ECF NO. 13].**

was submitted electronically for filing and/or service with the United States District Court, District of Nevada's e-filing system on the 16th day of October, 2023. Electronic service of the foregoing document was be made in accordance with the E-Service List as follows:

Robert J. Cassity
Erica C. Medley
**Holland & Hart LLP**
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
bcassity@hollandhart.com
ecmedley@hollandhart.com
*Attorneys for Defendants*

David A. Perez
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
dperez@perkinscoie.com
*Attorneys for Defendants*

Matthew J. Mertens
**PERKINS COIE LLP**
1120 N.W. Couch Street 10th Floor
Portland, OR 97209-4128
 mmertens@perkinscoie.com

I further certify that I served a copy of this document by mailing a true and correct copy thereof, postage prepaid, addressed to: N/A

*/s/* Kristofer Riklis
KRISTOFER RIKLIS, Esq.